UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Mirmalek v. Los Angeles Times Communications LLC
Case No. 3:24-CV-01797-CRB

FILED

APR 24 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

Julio Flores (hereinafter Class Member) respectfully submits this objection pursuant to Federal Rule of Civil Procedure 23(e)(5). Class Member accessed the website in question while in California (multiple times) during the time period of the settlement in 2023, 2024, and 2025.

Class Member does not oppose the settlement in principle. However, the proposed Settlement Agreement raises significant concerns that prevent the Court from making the findings required under Rule 23(e)—including whether the settlement provides adequate relief, treats class members equitably, and results from a fair and transparent process.

Here, since the settlement occurred before formal class certification, the settlement approval requires a "higher standard of fairness." Lane v. Facebook, Inc., 696 F.3d 811, 819 (9th Cir. 2012).

Taken together, the issues below reflect a settlement structure that lacks sufficient transparency and procedural safeguards, and that may discourage meaningful participation by class members.

## I. THE SETTLEMENT DOES NOT PROVIDE SUFFICIENT TRANSPARENCY REGARDING CLASS FUNDS

### A. Treatment of Unclaimed Funds Raises Legal Concerns

Federal courts approving class settlements must ensure that distribution provisions comply with applicable state property laws governing ownership of funds.

Section 2.1(d) of the Agreement provides for redistribution of unclaimed funds.

However, under California law, funds belonging to identifiable individuals are generally required to be preserved for their benefit and, where appropriate, transferred to the State Unclaimed Property. See California Unclaimed Property Law,

CA Civ Pro Code § 1500 (2025), et seq. State unclaimed property laws are compatible with class actions. All Plaintiffs v. All Defendants, 645 F.3d 329 (5th Cir. 2011).

The Agreement does not explain how its redistribution provision complies with these requirements. This Court must ensure that the settlement structure complies with applicable state law governing ownership of settlement funds. As the Court cannot determine whether the proposed structure is lawful or whether it improperly diverts funds away from class members, and further prevents the Court from determining whether class members' property interests are being extinguished without a lawful basis, it must deny the settlement at this time.

### B. Missing Information About Escrow and Interest

The Agreement does not disclose:

1. the terms governing any escrow account;
2. who receives interest earned on the settlement fund;
3. whether any financial relationships exist between the escrow institution and the Settlement Administrator.

Recently, it has been learned that settlement administrators have been receiving kickbacks at the expense of the class in other litigation by receiving a portion of the interest on the money held and by receiving money from the "breakage" as to digital payments. This has resulted in two MDL litigations. **MDL 3162** (case against the largest claims administrators because of their kickbacks from the banks holding the escrow and from breakage commissions received from digital payment providers).

The Ninth Circuit has cautioned courts to look for and scrutinize any "subtle signs that class counsel have allowed pursuit of their own self-interests... to infect the negotiations." _Dennis v. Kellogg Co._, 697 F.3d 858, 864 (9th Cir. 2012). Any financial arrangements involving interest-sharing, breakage, commissions, or other compensation paid by banks or electronic payment providers to the Settlement Administrator or related entities must be fully disclosed.

Without these disclosures, the Court cannot determine whether the settlement fund is being managed entirely for the benefit of the class, as required under Rule 23(e)(2)(C).

## II. CAFA NOTICE COMPLIANCE IS NOT ADEQUATELY DEMONSTRATED

The Agreement references CAFA notice (28 U.S.C. § 1715), but does not provide sufficient detail to confirm compliance.

### A. No Identification of Government Recipients

The Agreement does not identify which state or federal officials will receive notice. CAFA requires notice to specific officials, which are not always the state Attorney General.

Absent this information, the Court cannot determine whether the mandatory 90-day waiting period under 28 U.S.C. § 1715(d) has been properly triggered, and final approval would therefore be premature.

### B. Responsibility for Notice Is Improperly Delegated

The Agreement appears to assign responsibility for CAFA notice to the Settlement Administrator. However, the statute places that responsibility on the defendant. Moreover, it is unclear whether the defendant is overseeing responsibility, paying for the notices, and has fully complied by providing all of the documentation required. (In many recent cases, instead of sending the documents and required information, the Settlement Administrator would provide links or a dropbox).

This creates uncertainty regarding who is accountable for compliance and whether the statute is being properly followed. Moreover, since the statute puts the burden on the defendant to comply, if this expense is being shifted, it is not proper.

## III. THE OBJECTION PROCESS IMPOSES UNNECESSARY BARRIERS ON CLASS MEMBERS

Rule 23(e)(5) guarantees class members a meaningful opportunity to object.

The Agreement includes several requirements that make it harder for class members—especially those without lawyers—to submit objections.

### A. Duplicative Service Requirements

Section 4.2 of the Agreement requires objectors to serve multiple parties in addition to filing with the Court, which is not required by Rule 23. In federal court, electronic filing already provides notice to counsel. Requiring additional service creates unnecessary burden without clear benefit. Unfortunately, this situation must be corrected by removing the requirement, extending the objection deadline, and posting a clear notice on Page 1 of the website as to how to file objections. "'There should be no unnecessary hurdles that make it difficult for class members to exercise their rights to opt out, object, submit a claim, or make an appearance.'" *City of Livonia Employees' Ret. Sys. v. Wyeth*, 2013 WL 4399015, at *10 (SDNY Aug. 7, 2013)(quoting Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide, 3 (2010)).

### B. Requiring Legal Citations and Evidence

Section 4.3 of the Agreement includes the onerous and burdensome requirement that objectors include legal arguments and evidentiary support. Rule 23 does not impose these requirements. Many class members are not lawyers and should not be excluded from participation for that reason. This onerous requirement is meant to reduce objections because people may believe that they need to hire legal counsel to proceed.

### C. Intrusive Disclosure Requirements

Section 4.4 of the Agreement requires objectors to disclose:

any attorneys who assisted them;

prior objections they have made;

compensation received in other cases.

These requirements are not grounded in Rule 23 and impose burdens that are not necessary to evaluate objections on their merits. District courts have routinely declined to approve the objection procedure when these terms are present. *See Perkins v. New York Times*, No. 22-cv-5202 (PKC) (S.D.N.Y. 2024), accessed at https://scholar.google.com/scholar_case?case=8592716634559050041 and Arkansas v. Hudson Bay, Nos. 19-cv-4492 (PKC), 18-cv-8472 (PKC) (July 21, 2021 S.D.N.Y.) accessed at https://scholar.google.com/scholar_case?case=15419229481051950734

Any requirement to disclose the identity of an attorney that has provided assistance is inconsistent with applicable professional responsibility rules, including Rule 3.37 of the California rules and California Disciplinary Rule 1.2(b). Furthermore, an objector might use an out of state attorney to help them prepare or "submit" an objection, and other states have even more strict non-disclosure rules than California. It is ironic in a case about privacy that Class Counsel would want to infringe upon the confidentiality rights of objecting class members' relationship with legal counsel.

Courts must not make any impermissible credibility or standing inferences regarding individuals that bring serial litigation for the purpose of enforcement or advancement of civil rights. See *Langer v. Kiser*, 57 F. 4th 1085, 1099 (9th Cir. 2023).

While certainly an objector should disclose if they received payment *in this case*, whether or not an objector received a court authorized payment in other cases is simply not relevant to the merits of the objections.

### D. Violation of Rule 23(h) – Limited Access to Fee Materials

The objection deadline (April 22) appears to come before class members have meaningful access to the fee motion. As of April 20, 2026, the settlement website does not link to a copy of a motion for attorneys fees with any accompanying affidavits that could be objected to. However, Rule 23(h)(1) requires that, "Notice of the motion must be served on all parties and, for motions by class counsel, **directed to class members in a reasonable manner."** That simply did not happen. The undersigned had to purchase the motion from PACER, which contained over 100 pages of documents. Rule 23(h)(2) states, "A class member, or a party from whom payment is sought, may object to the motion." But how? Class members were not provided direct notice of the fee motion in a reasonable manner as required by Rule 23(h). Putting the notice on the website is not "targeted to class members," but Class Counsel did not even do that.

# Important Documents

Mirmalek v. Los Angeles Times Communications LLC

Please read for a full explanation of the Settlement and your options and all applicable timelines.

## Documents

⬜ Mirmalek v. Los Angeles Times Communications LLC - Settlement Agreement (PDF: 7.27 MB)

⬜ Mirmalek v. Los Angeles Times Communications LLC - Preliminary Approval Order (PDF: 209.11 KB)

⬜ Mirmalek v. Los Angeles Times Communications LLC - Long Form Notice (PDF: 276.35 KB)

⬜ Mirmalek v. Los Angeles Times Communications LLC - Claim Form (PDF: 136.19 KB)

> This Settlement Website is authorized by the Court, supervised by Counsel for the Parties, and controlled by the Settlement Administrator approved by the Court. This is the only authorized website for this Settlement.

| Call | (833) 754-7789 |
|------|----------------|

The Ninth Circuit has held that class members must have a fair opportunity to review and object to fee requests before the objection deadline. See In re Mercury Interactive Corp. Securities Litigation. Requiring class members to locate materials through PACER, potentially at cost, does not satisfy this requirement or Rule 23(h). *Mercury* requires the motion be targeted to the class members with sufficient time to respond.

The website advises that Class Counsel "may seek" fees, but does not say that they did or how to object, and it tries to downplay the amount by stating the court may not award that much:

13. How will the lawyers be paid? ⌄

Class Counsel's attorneys' fees, costs, and expenses will be paid from the Settlement Fund in an amount determined and awarded by the Court. Class Counsel is entitled to seek no more than one-third of the $3.85 million Settlement Fund, but the Court may award less than this amount.

As approved by the Court, the Class Representative will be paid an incentive award from the Settlement Fund for helping to bring and settle the case. The Class Representative will seek no more than $5,000 as an incentive award, but the Court may award less than this amount.

Therefore, this Court must direct Class Counsel to notify every class member (either claimants or people that they have from their list) via email or mail if there is no email, and to provide a 30 day period to object.

## IV. THE CLAIMS PROCESS LACKS BASIC SAFEGUARDS AND BALANCE

### A. Lack of Transparency in Administration

This Court is obligated to control the claims process, not to delegate it to Class Counsel. F.R.Cv.P. 23(e)(2)(C)(ii).

The Settlement Agreement does not disclose the terms governing the Settlement Administrator or any financial incentives that may affect claim processing or the benefits to the class.

It has recently come to light that many well known Settlement Administrators (including the Settlement Administrator in this case) have been alleged in pending multidistrict litigation to engage in financial arrangements that may create misaligned financial incentives involving banks holding settlement funds and payment vendors. See In re: Class Action Settlement Administration Litigation, MDL 3162. Claims Administrator Kroll, while in fairness have denied the allegations, has been named as a defendant in the pending MDL involving alleged kickback arrangements. The Settlement Agreement contains no disclosure that would allow the Court to determine whether any such arrangements exist here and nothing in Class Counsel's motion addresses these known kick-back schemes that have been occurring with the largest and most well-known claims administrators.

These alleged kickback arrangements, along with practices involving breakage, dormancy fees, and diversion of interest away from the settlement fund, demonstrate why courts must closely review the actual administration of class settlements rather than assume that claims administration is neutral or conflict-free. In many cases, courts are not provided with the underlying agreements governing claims administration and therefore cannot meaningfully review the financial incentives, subcontracting arrangements, or consumer-facing obligations imposed on class members. Frequently, as is the case here, agreements with sub-administrators and payment vendors are not disclosed at all, leaving the Court without visibility into the full administration structure. Without the disclosure of any pertinent agreements with the Settlement Administrator, the Court cannot evaluate whether the claims process is fair and reliable.

Courts routinely approve the appointment of claims administrators without reviewing the full terms governing those relationships, including subcontracting arrangements, payment processor agreements, data retention policies, and the consumer-facing terms imposed on claimants receiving settlement payments.

In many cases, settlement administrators retain third-party payment vendors such as Digital Disbursements, Blackhawk Network, or similar providers to distribute funds through prepaid cards, digital payments, or other electronic methods. These arrangements may involve additional fees, breakage, dormancy provisions, arbitration clauses, account freezes, identity verification requirements, or other material restrictions that directly affect the value of the relief actually received by class members.

The Settlement Agreement does not disclose whether such subcontracting exists here, the terms governing those arrangements, whether any commissions, interchange fees, or breakage payments are received by the Settlement Administrator or its subcontractors, or what claimant data is shared, retained, or used by such third parties.

This omission is particularly concerning in a privacy case involving consumer data. Class members should not be required to surrender additional personal information, accept undisclosed cardholder agreements, or expose themselves to additional privacy risks as a condition of receiving settlement funds without full disclosure and Court approval.

Without disclosure of these agreements and their material terms, the Court cannot fulfill its independent duty under Rule 23(e)(2)(C)(ii) to ensure that the method of distributing relief to the class is effective, fair, and free of undisclosed conflicts.

### B. Reporting Is Optional Rather Than Required

Section 5.1 of the Agreement states that the Court "may" request a report regarding claims administration. Given the importance of this process, reporting should be required. Without it, neither the Court nor class members can assess how the settlement is being implemented, and the class members have a right to know about the work, funds paid, etc.

### C. Deficiency Notices Are Not Adequately Defined

Section 5.2 of the Agreement directs the Settlement Administrator, in the event of a claim's denial, to provide a notice of deficiency and an opportunity to cure. This provision is fair so long as the notice provides clear details on what needs to be corrected. The provision as written, however, is not sufficiently specific. In many class actions, Settlement Administrators simply send bulk emails stating they have found the claimant's submission to be deficient, but do not provide any information that would allow a claimant to easily determine what the problem was with the submission of the claim, requiring further inquiries and complaints from each individual claimant to ascertain the nature of the Administrator's concern. The additional correspondence results in additional administration expenses to be borne by the Class. Furthermore, due to the small size of the majority of settlement payments, most claimants are unlikely to bother corresponding further, which creates a very real risk that valid claims may be rejected without meaningful opportunity to cure.

Based on reports made by class members in the respective cases as well as public records, in some settlements (Lithium Ion Battery Antitrust and Botanic Tonics Litigation being notable examples) administrators have relied on low quality domain name services that they pay about $25 per month to screen domains or email "rejection" lists that are highly inaccurate. Ironically, the Settlement Administrator then sends a claim or payment rejection notice to the email address that they claim, based on the list or database, is "invalid." The claimant receives the rejection notification, which would seem to be prima facie evidence that said email address or domain is indeed valid. Therefore rather than utilizing such databases, the Settlement Administrator could create a simple email verification system for claimants to verify their email (by clicking on a link, etc.) rather than wholesale and inaccurate denials based on questionable rejection lists.

A claims process that rejects valid claims without clear explanation undermines the adequacy of relief under Rule 23(e)(2)(C). Without minimum standards for deficiency notices, including a requirement that the deficiency notice specifically advise the claimant as to why their claim was being considered for denial, and a full opportunity to fix the problem or appeal, renders the claims process inadequate, violative of due process, and opaque to both claimants and the Court.

Class members have a protected property interest in the claims being resolved through the class action process and must be afforded fundamentally fair procedures. Denying claims based on extraneous factors such as the domain name of their email provider, unreliable lists from third parties not approved by the court, or other factors are not relevant to whether the claimant is a class member.

### D. One-Sided Challenge Rights

Section 5.3 of the Agreement allows Class Counsel and Defendant to challenge acceptance or rejection of claims, but does not provide class members with a similar ability to challenge denials. However, if any party has a direct right to challenge a rejection, it is the class member that is making the claim. See Roes 1-2 v. SFBSC Management LLC, 944 F3d 1035, 1043 (9th Cir. 2019). Class members have a due process interest in their claim, whereas Class Counsel and the Defendant have no interest in whether a claim is denied.

This imbalance raises fairness concerns. Because the Class member has a direct interest in his or her own claim, he or she should be given notice and an opportunity to respond if his or her claim is rejected for any reason.

This asymmetry is inconsistent with basic procedural fairness and the due process interests of class members. See e.g., Klier v. Elf Atochem, 658 F3d 468, 474 (5th Cir. 2011), citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 807–08 & 812–13 (1985); Logan v. Zimmerman Brush Co., 455 U.S. 422, 428–30 (1982)("each class member has a constitutionally recognized property right in the claim or cause of action that the class action resolves." ).

## V. THE REQUESTED ATTORNEY FEES AND REIMBURSEMENTS REQUIRE CAREFUL REVIEW

The Ninth Circuit has stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs. See In re WPPSS Litigation, 19 F.3d 1291, 1302 (9th Cir. 1994).

### A. The Presentation of Fees May Be Misleading

The Agreement states that fees are capped at $1,283,333.33, but additional costs (such as administration and notice) are also deducted from the fund. This may make the settlement appear more favorable than it actually is. Indeed, we have no idea what Kroll was paid, what Kroll paid Digital Disbursements, what Digital Disbursements paid Blackhawk, and what Blackhawk paid Pathward (or vice versa considering that kickback may occur for breakage).

### B. The Multiplier Is High and Unjustified

The motion for attorney fees, which Class Member was required to obtain through PACER at personal cost since it is not provided to class members for free on the settlement website, shows that Class Counsel is receiving a 2.2 multiplier. However, there is no record-supported justification for effective rates exceeding $1,500 per hour for attorney work on this case.

### C. Fees Must Reflect Actual Benefit to the Class

The Ninth Circuit has repeatedly held that the basis of attorney fees should be upon the actual amount that class members will be receiving. It should not be based on advertising, the settlement administrator's costs, or the cy pres. See In re Bluetooth Headset Products Liability Litigation. However, it is clear that these amounts are being aggregated into the 33.3% that Class Counsel is basing its recovery on, rather than the actual benefit delivered to the class. Including the mentioned fees, the attorneys, Settlement Administration, etc. will likely receive over 50% of the amount the class members will actually receive. Of course, class counsel never itemized what they are paying Kroll and their associates in this case.

### D. The Incentive Award Is Not Supported by the Record

A $5,000 incentive award in a case where the settlement amount is so small is excessive. Class Counsel should disclose their agreements with the class representative to assure there is no conflict of interest. This Court has not reviewed, asked for, or disclosed the terms of Class Counsel's representation of the class representative. Class Counsel needs to justify why $5,000 is being paid, including the hours the representative spent on the matter and the work that was performed. See Shane Grp., Inc. v. Blue Cross Blue Shield of Mich., 825 F.3d 299 (6th Cir. 2016). Without such information, the Court cannot determine whether the award is reasonable. See Staton v. Boeing, 327 F.3d 938, 977 (9th Cir. 2003). The class needs to know what promises were made to the class representative.

It is noted that the attorney fee log does not reveal much communication with the Plaintiff, and her declaration at ECF 60-10 fails to state the amount of time spent on the litigation. For

example, $50 an hour might be reasonable, but did the plaintiff spend 100 hours on this case? *See Wilson v. Tesla, Inc.*, 833 Fed. Appx. 59, 62 (9th Cir. 2020)($50 to $75 an hour is reasonable). The attorney log does not indicate that she did.

### E. Certain Fees and Expenses Appear Excessive or Not Reasonably Necessary to Benefit the Class

Class Counsel bears the burden of demonstrating that requested fees and expenses were reasonably incurred for the benefit of the class. Expenses that primarily served counsel's own litigation strategy, convenience, or unnecessary prolongation of the litigation should not be charged against the common fund.

The billing records reflect substantial time devoted to issues that did not directly increase the recovery obtained for the class, including extensive work on remand proceedings and jurisdictional discovery. While some such work may have been necessary, the Court should closely scrutinize whether those efforts materially benefited the class or merely prolonged the litigation.

The records also reflect significant charges for attorney travel time and travel expenses, including airfare and related costs. Travel time billed at full hourly rates warrants careful review, particularly where the records do not indicate that substantive legal work was performed during travel. Courts routinely reduce or disallow such charges where they do not reflect productive legal work that benefited the class.

In addition, the billing records appear to include work relating to CAFA notice compliance, even though CAFA places that obligation on the defendant rather than on class counsel. To the extent class funds are being used to compensate counsel for work that should have been performed at defendant's expense, such charges should be disallowed.

The Court should require a clear itemization of expenses paid to the Settlement Administrator and any subcontractors involved in notice, payment processing, or administration so that fees are evaluated based on the actual benefit delivered to the class rather than on undisclosed administrative costs.

## VI. CY PRES SHOULD NOT BE COUNTED AS CLASS RELIEF

To the extent the settlement relies on cy pres distributions to demonstrate value, this is misleading. Cy pres distributions cannot substitute for direct relief to the class. The Ninth Circuit has cautioned against relying on indirect or illusory benefits to justify settlement value. Indeed, the designated Cy pres recipient will likely be completely unknown to most Class Members. The money goes to the Consortium of Cybersecurity Clinics, but this is not a data breach lawsuit, it is a privacy lawsuit. *See Powell v. Georgia-Pac. Corp.*, 119 F.3d 703 (8th Cir. 1997) *(examining the relationship between the class members' interests and those of the proposed cy pres recipient)*.

Any cy pres distribution should be considered only after full direct compensation to class members and should not be used to inflate the perceived value of the settlement for purposes of fee approval.

## VII.  THE CLAIM FORM AND NOTICES PROVIDE INACCURATE INFORMATION

A review of the electronic claim form as of April 19, 2026, tells claimants that they cannot file a claim after April 20, 2026.  This information disseminates through Google and search engines, so people may not bother to try to file a claim due to this error.

Claim Form Instructions

*Mirmalek v. Los Angeles Times Communications, LLC*
*Case: 3:34-CV-01797-CRB*
United States District Court for the Northern District of California

If you received Notice of the Settlement in this class action lawsuit, records indicate you are a Settlement Class Member. Otherwise, Settlement Class Members are all Persons who accessed LA Times online via website or mobile app in California and had their information collected by tracking technologies between January 31, 2023, to and through December 19, 2025.

To be eligible to receive any benefits from the Settlement, you must submit a completed Claim Form online or by mail. Each Settlement Class Member is entitled to submit only one Claim Form. Please read the full notice of this Settlement (available at www.LAtimescipasettlement.com ) carefully before filling out this Claim Form.

**To receive a cash payment from the Settlement Fund, you must complete and submit this Claim Form by April 20, 2026 at 11:59 PM PT.**

 I Agree

However, in other places it states the deadline is May 20, 2026:

## Claims Deadline

**Wednesday, May 20, 2026**

You must submit your online Claim Form no later than 11:59 p.m. PT on Wednesday, May 20, 2026, or mail your paper Claim Form postmarked no later than Wednesday, May 20, 2026.

Another problem is that the settlement agreement states that a "person" is:

**1.19** **"Person"** shall mean, without limitation, any individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or age thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, or assigns. "Person" is not intended to include any governmental agencies or governmental actors, including, without limitation, any state Attorney General office.

However, the Claims Form (paper and online) only allows a person to enter their "First Name" and "Last Name." There is no space for "corporation, partnership, limited partnership, limited liability company, association, joint stock company," etc.

More importantly, while the settlement agreement explains that businesses can file claims, they certainly will not know that. The Frequently Asked Questions on the website only uses the word "person" and does not define it:

5. How do I know if I am in the Settlement Class?   ⌄

The Settlement Class is defined as: All Persons who accessed LA Times online via website or mobile app in California and had their information collected by tracking technologies between January 31, 2023 through to, and including, December 19, 2025.

Retrieved from https://www.latimescipasettlement.com/faq

The Long Form Notice also does not inform anyone that businesses are eligible:

## WHO'S INCLUDED IN THE SETTLEMENT?

**5. How do I know if I am in the Settlement Class?**

The **Settlement Class** is defined as:

all Persons who accessed LA Times online via website or mobile app in California and had their information collected by tracking technologies between January 31, 2023 through to, and including, December 19, 2025.

If you were the owner of a business, unless your manager read the entirety of the settlement agreement, when looking at the claim form, the notice, and the FAQ of the website, you would likely think that only individuals were eligible.

If businesses are not proper claimants, then the settlement agreement must be modified to exclude businesses. If businesses are included, then the notice, claim form, and website must say so. This Court should expand the time period for businesses to file a claim once the matter is corrected. While Class Member submits this objection in an individual capacity, he also holds a minority ownership interest in a business that accessed the website from California and therefore raises this issue to ensure the notice and claims process accurately reflects the scope of the proposed class definition.

## VIII. THE SECTION 1542 WAIVER RENDERS THE SETTLEMENT UNFAIR

At Section 1.33, the Settlement Agreement includes a waiver of rights under California Civil Code § 1542. This provision is overbroad and inappropriate given the limited nature of the claims asserted in this case.

This action concerns alleged violations arising under a specific privacy statute and related claims tied to the conduct at issue. A broad Section 1542 waiver, however, extends far beyond the claims actually litigated and may extinguish unknown claims that class members could not reasonably anticipate, including claims unrelated to the specific statutory allegations resolved here.

This concern is particularly significant for absent class members who do not file claims or may be unaware of the litigation altogether. Such individuals should not be deemed to have released unknown and unrelated claims without a clear showing that such an expansive waiver is necessary, justified, and narrowly tailored to the settlement.

California courts have recognized that Section 1542 waivers require careful scrutiny and are generally disfavored absent specific justification. Courts have explained that such waivers are not automatically appropriate and require both legal authority and factual support demonstrating why the circumstances warrant extinguishing unknown claims. See *Israel-Curley v. California Fair Plan Assn.*, 126 Cal. App. 4th 123, 129 (2005); *Salehi v. Surfside III Condominium Owners' Assn.*, 200 Cal. App. 4th 1146, 1159–61 (2011).

Likewise, California judicial guidance on class settlements states that "a section 1542 waiver by absent class members is generally inappropriate in the class settlement context." Judge Melissa McCormick, *Guidelines for Approval of Class Action Settlements & PAGA Settlements* at 12 (Sept. 3, 2025).

Here, the parties have not provided any record-supported justification explaining why such a broad waiver is necessary in a settlement involving a single statutory privacy claim. Without that showing, the Court cannot conclude that extinguishing unknown claims satisfies Rule 23(e)'s requirement that the settlement be fair, reasonable, and adequate.

At minimum, any release should be limited to claims arising from the specific conduct alleged in this action and should not include a blanket waiver of unknown claims under Section 1542.

## IX. CONCLUSION

The Court has an independent duty to ensure that any class action settlement is fair, reasonable, and adequate. See Officers for Justice, 688 F.2d at 625.

Here, the lack of transparency in fund management, the imbalance in the claims process, and the barriers imposed on objectors prevent the Court from making those findings required under Rule 23(e).

For these reasons, Class Member respectfully requests that the Court:

deny final approval; or

defer approval until the parties provide additional disclosures and make the following corrections:

clarify escrow and interest arrangements;

confirm compliance with CAFA notice requirements;

remove unnecessary barriers to objections;

implement fair and balanced claims procedures; and

provide a clear and complete disclosure of fees, costs, and contractual arrangements relating to settlement administration.

Objector respectfully preserves all issues raised herein for purposes of appellate review.

Respectfully submitted,

Julio Flores
13708 Cordary Ave #261
Hawthorne, CA 90250
jflores@telcelmail.com

CHARLES E. GRASSLEY, IOWA, CHAIRMAN

LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
JOSH HAWLEY, MISSOURI
THOM TILLIS, NORTH CAROLINA
JOHN KENNEDY, LOUISIANA
MARSHA BLACKBURN, TENNESSEE
ERIC SCHMITT, MISSOURI
KATIE BOYD BRITT, ALABAMA
ASHLEY MOODY, FLORIDA

RICHARD J. DURBIN, ILLINOIS
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII
CORY A. BOOKER, NEW JERSEY
ALEX PADILLA, CALIFORNIA
PETER WELCH, VERMONT
ADAM B. SCHIFF, CALIFORNIA

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510-6275

June 16, 2025

**VIA ELECTRONIC TRANSMISSION**

The Honorable John G. Roberts, Jr.
Chief Justice
Supreme Court of the United States

The Honorable Robert J. Conrad, Jr.
Director
Administrative Office of the United States Courts

Dear Chief Justice Roberts and Judge Conrad, Jr.,

According to recent reports, Class Action Claims Administrators, which are companies selected by federal courts to handle the class action settlement process, are receiving "kickbacks" from certain Financial Technology Companies ("FinTechs") for hiring them to distribute class action settlement payouts.[1] These payouts are done through prepaid digital cards. According to these reports, FinTechs are charging injured class members high inactivity fees, in some instances after only six months, and deducting this fee from the balance on the prepaid settlement cards.[2] This effectively takes financial compensation amounts from the injured party and gives it back to the Claims Administrator. Reports say that FinTechs, in turn, will give Claims Administrators "rebates and discounts" on how much they charge for their services based on how much the FinTechs collect from these inactivity fees.[3] Some reports estimate that FinTechs and Claims Administrators have collected roughly $300 to $400 million of unspent settlement money through rebates, discounts, and inactivity fees that was meant to compensate injured class members.[4]

Reports have noted that in some cases, the inactivity fees charged by FinTechs are so high and reoccur so often that they will subsume the entire balance of class action settlement loaded on the prepaid digital card within months.[5] For example, in one case, the inactivity fee was $5.95 per month for a prepaid card that only had $7.44 on it.[6] While this may seem minimal, these inactivity fees in large class action settlements can result in tens of millions of dollars being collected by FinTechs rather than compensating injured class members.[7]

These reports raise concerns that there appears to be very little oversight by the federal courts on Claims Administrators using digital prepaid cards to facilitate class action settlement payouts.[8] Reporting also shows that the vast majority of federal courts do not require Claims Administrators to tell the court how much of the settlement actually ended up in the hands of the injured class members.[9]

---

[1] Amanda Bronstad, *Lawsuit: Claims Administrators Get Kickbacks for Digital Payments*, LAW.COM (April 25, 2025) https://www.law.com/2025/04/25/lawsuit-claims-administrators-get-kickbacks-for-digital-payments/?slreturn=20250602163759; Jeff Kauflin, *How Private Equity-Owned Companies Quietly Pocket Class Action Payouts*, FORBES (May 21, 2025, 6:30 a.m.) https://www.forbes.com/sites/jeffkauflin/2025/05/21/how-private-equity-owned-companies-quietly-pocket-class-action-payouts.
[2] Bronstad *supra* note 1; Kauflin, *supra* note 1.
[3] Bronstad *supra* note 1; Kauflin, *supra* note 1.
[4] Bronstad *supra* note 1.
[5] *Ibid.*
[6] *Ibid.*
[7] Kauflin, *supra* note 1.
[8] *Ibid.*
[9] *Ibid.*

So that Congress may conduct objective and independent oversight on this matter, please provide answers to the following no later than June 30, 2025:

1. Has the Administrative Office of the United States Courts (AO) or Judicial Conference of the United States (JCUS) been made aware of the issues surrounding the use of digital prepaid cards in distributing class action settlements? If so, what steps have the courts taken to address them?

2. In light of these reports, will the AO or JCUS limit the use of digital prepaid cards in class actions settlements, as well as the "rebates and discounts" that Claims Administrators are receiving from FinTechs or other sources?

3. What is the current policy on the use of Claims Administrators in class action settlements? Has the AO or JCUS taken any steps to review or study that policy to ensure that Claims Administrators are fulfilling their duties and adequately and accurately reporting information to the courts?

4. Under the current policy, what happens to unspent class action settlement payments?

5. Do courts generally track how much in unspent class action settlement money is outstanding? If so, how much is recouped and where does it go?

Thank you for your prompt review and response. If you have any questions, please contact Tucker Akin of my Committee staff at (202) 224-5225.

Sincerely,

Charles E. Grassley
Chairman
Committee on the Judiciary

MONEY > FINTECH



DAILY COVER

## How Private Equity-Owned Companies Quietly Pocket Class Action Payouts

ILLUSTRATION BY EMILY SCHERER FOR FORBES; PHOTOS BY HANS NELEMAN, EYEEM MOBILE GMBH, SOUBRETTE / GETTY IMAGES

By **Jeff Kauflin**, Senior Editor.  A senior editor based in NJ, Jeff covers...      ⌄      Follow Author

Published May 21, 2025, 06:30am EDT, Updated May 21, 2025, 09:49am EDT

≺   ⊓

Online prepaid cards have proliferated as a way to compensate consumers harmed by companies. Critics say fintechs and claims administrators have unfairly profited from the trend.

L ast December, Callista Womick, a 34-year-old consultant living in Asheboro, North Carolina, got an email instructing her to click on a link to claim a digital prepaid card. A phishing scam? Nope, the card was legitimate and for $7.44–her share of what was left in the kitty from a class action

lawsuit brought against Equifax over a 2017 data breach of the credit bureau that exposed the personal information of 147 million Americans.

Legit, but problematic. Dartmouth grad Womick found using the tiny amount a "brain-teaser," since online merchants typically don't let you combine multiple payment methods to make a purchase. Eventually, she figured out she could use the card to buy Amazon gift card credits, which she could then put towards a larger purchase. "It would have been nice if they gave me a tip on how to do that," she says.

Donna Lowe, a 30-year-old 911 dispatcher from Atlanta, also opened the email, clicked on the link and activated the prepaid card. Then she gave up. "I had a hard time figuring out what I'd do with the $7.44," Lowe says. "I just eventually forgot about it." Forgotten, and soon gone–after six months, the card, issued by Blackhawk Network, starts charging a hefty $5.95 per month inactivity fee, essentially confiscating her payout.

Lowe isn't alone. *Forbes* estimates that over the past five years, $300 to $400 million of damages distributed to injured consumers through digital prepaid cards has been left unspent—money known in industry jargon as "breakage." Here's the disturbing thing about breakage: The unused money doesn't go back to the settlement fund or to not-for-profits working in areas related to the suit, as it usually does when paper settlement checks aren't cashed or when a recipient never activates the card.

Instead, the unused funds end up lining the pockets of the fintech companies that issue the card (mainly gift card giant Blackhawk Network and New York startup

Tremendous), the banks they partner with and the very class action administration companies that award the contracts for the digital cards.

Compared with the tens of billions in class action settlements reached each year, the amount lost might seem modest—except that use of digital payouts in mass class actions is now exploding, meaning consumers could lose a lot more in the future if the problems with digital prepaid cards aren't addressed. Whereas payouts used to all be done via paper checks, Digital Disbursements, a Los Angeles-based fintech that offers a platform enabling consumers to choose among payment methods (including electronic ones) in class action settlements, handled 426 class action suits in 2024, up 82% from 234 in 2023.

These days, participants in a mass class action are often given a choice of how they want their payouts. During the first round of distributions from the $425 million Equifax settlement, claimants could opt for a paper check, a payment to their PayPal account or the digital prepaid card. (In some other cases, claimants can have money sent to their bank account through direct deposit or the bank money-transfer app, Zelle.) But in the second Equifax disbursement round, the tiny distributions were all made via digital prepaid cards, sparking consumer confusion and complaints.

Other large class action cases, such as the $264 million settlement with Mylan for

allegedly inflating the prices of its EpiPens, have also drawn many consumer complaints about the difficulty of using the digital prepaid cards, which were offered as an option alongside other payment methods such as Venmo and paper checks.

There's actually a strong case for using digital notices and various forms of digital payments in mass class actions. Postage is expensive, and paper checks are susceptible to fraud and often go uncashed. In 2021, after Plaid (which links financial apps and consumers' bank accounts) agreed to pay $58 million to settle a class action lawsuit over data privacy, the claims administrator estimated it would cost $20 million in postage alone to send claim-form postcards to 62 million people. The administrator ended up notifying most of those injured by email and letting consumers choose between direct deposit, PayPal, Venmo and paper checks. The total administrative costs came to just $3.9 million, according to a court filing.

The problem with digital prepaid cards, however, is that they're subject to few rules and little oversight. For example, the federal Card Act prohibits inactivity fees from kicking in before a normal gift card has gone unused for a full year, and some states have longer waiting periods or ban inactivity or "card maintenance" fees altogether. But those laws don't apply to the prepaid cards issued in litigation settlements. So Blackhawk was free in the Equifax case to debit a $5.95 monthly fee after only six months.

Just as troubling, the judges approving settlements and the plaintiffs' lawyers representing consumers are largely unaware of how the digital cards work, or who is collecting the breakage they generate. Shockingly, of the 94 federal district courts in the U.S., only one, the Northern District of California, requests a "Post-

Distribution Accounting" report detailing how much of a class action settlement actually ended up in the hands of individuals who were harmed, as opposed to the lawyers, class action administrators and not-for-profits. And according to a 2024 University of California law school study, that commendable guidance is ignored in more than half the class cases in the district anyway. When these reports are filed, they detail uncashed paper checks (since that money is going back to the class), but not the money lost to digital-card breakage.

Truth is, digital prepaid card abuses are just the latest issue in a class action system riddled with other older and better-known problems—for example, plaintiffs' lawyers get too much of the money (often 25% or more of the settlement), and fewer than 5% of consumers eligible for payouts typically end up getting anything due to low response rates.

Still, despite such failings, class action lawsuits can be an effective tool for holding companies accountable and forcing reforms in harmful practices, particularly when a large group of plaintiffs have suffered small damages—too small for individual suits to make sense.

So it's only fitting that a new class action suit was filed last month in the Eastern District of Pennsylvania against three big class action administration companies, all of which are owned by private equity firms, alleging they "reap huge profits from so-called 'revenue sharing' payments for using digital payment cards." The suit, which accuses them of fraud and various other breaches, asserts that, "In reality, these revenue sharing payments are nothing more than kickbacks." Moreover, the lawsuit says, the administrators have kept these agreements secret from attorneys, judges and class members, even setting up "special purpose entities ('SPEs') to conceal their receipt of kickbacks."

***Have a story tip?*** *Contact Jeff Kauflin at jkauflin@forbes.com or on Signal at jeff.273.*

**T**odd Hilsee, a founder and former president of a class action administration firm and an expert on class action notification procedures, began investigating prepaid cards in 2022. A source had told him rebates and discounts were being paid to the class action administrators out of the fintechs' breakage spoils—without the payments being disclosed to the judges overseeing cases or the lawyers involved.

Electronic payouts began growing after federal class action guidelines were changed in 2018 to specifically permit electronic notice and distribution. In 2020, as Covid-19 sparked a surge in online transactions, that growth accelerated. Suddenly, there was real money at stake.



Todd Hilsee, a class action lawsuit distribution expert, has been investigating hidden profits in prepaid digital cards since 2022.
**COURTESY TODD HILSEE**

Hilsee's best evidence of what sounds like a kickback: a November 2020 email in which a Blackhawk executive pitches a settlement administrator on distributing the funds through a Virtual MasterCard Disbursement card. "We actually pay you to issue these cards," the executive wrote, adding that "you would net $100,000 to $175,000 additional revenue." (Hilsee published this email in an October 2024 paper, with the names of the individuals and companies redacted. *Forbes* confirmed through our own reporting that a Blackhawk employee sent the email.)

Based on that email, the "additional revenue" slipped to a settlement administrator could easily total millions of dollars in a large case, since the Blackhawk salesperson was offering a rebate of up to 3.5% of the total money that was supposed to be disbursed through digital prepaid cards. Blackhawk declined to comment on the email, but noted in a statement that it complies with all applicable laws.

"If they're receiving some type of hidden kickback, first of all, it's inappropriate that the court isn't informed about it," says Senior District Judge Edward Davila of the Northern District of California. "Of equal importance, it seems that money should be reduced from their [settlement administration] fees."

"This should never be happening, and everyone in this industry knows this shouldn't be happening," declares J. Eli Wade-Scott, who leads the prominent class action practice at Chicago-based law firm Edelson. He adds that administrators should be disclosing what they do with every cent. "There's no option to surreptitiously redirect money to yourself as an administrator or as a vendor." If an administrator or vendor is omitting the existence of rebates, he says, it would "give rise to a fraud claim."

That's part of what the new class action lawsuit against Angeion Group, Epiq Systems and JND Legal Administration alleges: fraud. The suit says the rebates from fintechs were material information that should have been disclosed before a settlement administrator was chosen for any case, since "this compensation would be paid out of the gross settlement proceeds and diminish the amount of money available to compensate the plaintiffs and the classes in such cases."

We made repeated interview requests to the largest settlement administrators, including the three named in the suit, as well as A.B. Data and Kroll. Not one granted us an interview or answered the detailed questions we emailed. Angeion provided an emailed statement calling the new lawsuit "meritless" and "based on a fundamental misunderstanding of what happens with unspent card balances for class members who choose to receive prepaid gift cards as their method of payment." It added that Angeion "scrupulously honors the terms of the settlements it administers." A JND spokesperson called the lawsuit "baseless."

A representative for smaller settlement administrator Simpluris says the company has never accepted a rebate from a fintech company. In a blog post responding to Hilsee's allegations of improper rebates, administrator Rust Consulting wrote that it "has never engaged in a scheme such as that."

One executive at another, smaller administration firm who talked to us on the grounds he not be identified said he hasn't seen such rebate offers recently and that the industry seems to have moved toward a model where digital payouts are bundled and priced more cheaply upfront to account for the breakage the card companies get to keep. Even if he's correct that rebates to administrators are now less common, breakage still means class members are being short-changed, since the money ends up in the pockets of the digital card providers, not back in the

settlement funds, and isn't disclosed to the court.

Blackhawk declined to grant us an interview or answer our detailed questions but provided a statement in response. It read in part, "While it's accurate that unused balances on prepaid cards may incur inactivity fees or expire over a reasonable period of time—terms that vary by program—this practice is neither secretive nor unique. These details are in full compliance with applicable federal and state laws and regulations and are disclosed upfront to the client or recipient (as applicable) in comprehensive terms and conditions."

Jeff Richardson is cofounder and CEO of Digital Disbursements, a platform that has now been used for electronic payouts in more than 1,000 cases—it creates the user interface for consumers but doesn't issue prepaid cards itself. While declining an interview, he said in emails to *Forbes* that "not all prepaid cards are the same" and that settlement administrators should accept only those that are "class-member friendly."

What makes a card class-member friendly? Richardson said he has negotiated with Digital Disbursements' card-issuing partner Blackhawk to offer cards with lower inactivity fees of $0.95 per month instead of $5.95 and a longer waiting period of 12 months before inactivity fees kick in. He says Digital Disbursements pioneered a method that lets consumers transfer the balance from a card to a bank account, Venmo or PayPal, which some cards don't allow.

Banks are involved in—and profit from—this problem too since they create the accounts in which the digital-card funds are held (until they're spent by consumers or swallowed up by fees). Sioux Falls, South Dakota-based Pathward, Blackhawk's bank partner, declined to grant an interview or answer our emailed questions,

saying in a statement that "Compliance with laws and regulations and the integrity of the judicial process are of utmost importance to Pathward."

Banks act as custodians for class action settlement money, regardless of whether it's distributed by check or electronic means. The number-one player in that business is Huntington, a 159-year-old Ohio bank, which said in an emailed statement that 95% of its disbursement business is still paper checks and that "fairness, transparency, and consumer choice are fundamental to Huntington Bank's payment solutions."

Another big player is Phoenix-based Western Alliance Bank, which acquired Digital Disbursements in 2022 and runs it as a separate subsidiary. Neither bank would comment specifically on the rebates fintechs have provided to claims administrators, but they're likely aware of the problem. Hilsee says that a large bank approached him with concerns about the rebates fintechs were giving to administrators, yet when he suggested bringing the issue to the government's attention, the bank demurred, saying it was worried about "unintended consequences."

The bank probably feared opening a can of worms. Three industry insiders, all speaking to *Forbes* on the condition they not be named, told us that claims administrators sometimes take a cut of the interest income earned by settlement funds in the months or years before they're distributed. As a matter of best practice, says class action lawyer J. Eli Wade-Scott, settlement money should be parked in an interest-bearing account, with the interest ultimately distributed to members of the class. But if a settlement agreement doesn't spell that out, and the plaintiff's lawyers aren't so conscientious, there's room for administrators to pocket some of the interest. The issue became more salient after the Federal

Reserve began raising interest rates in 2022, since the potential interest in play grew much larger.

A spokesperson for Western Alliance Bank didn't deny the practice, telling us in a statement, "Our clients, including claims administrators, choose the type of accounts (interest bearing versus non-interest bearing) they establish and how interest earned is dispositioned. As a financial institution, our role is to follow the direction of our account holder. The disposition of interest earned is a matter between claims administrators and their clients."

One of our sources, a former employee of a claims administrator, says that he was surprised by the extra revenue flowing in from banks. "Suddenly, we were making a lot of money that had nothing to do with the administration of benefits to class members," he says. He asked a coworker whether the company needed to disclose the income as a separate revenue stream to the courts but was told no, since it was standard practice. It struck him as odd, given that judges need to approve claims administrators' fees. "When these administrators are pulling down 4% straight to them, with no benefit to the fund, there won't be a judge in the country that will think that's right," another former claims administrator employee tells us.

---

**B**oth **Blackhawk and Tremendous,** the two biggest issuers of electronic prepaid cards for litigation settlements, have some experience themselves as targets of class action suits.

Tremendous CEO Nick Baum cofounded a service called GiftRocket.com in 2010 before launching Tremendous as its sister company in 2018. GiftRocket published lists of tens of thousands of restaurants and retailers on its website and prompted consumers to choose any of them to create a virtual gift card. The problem: You

couldn't actually use the card directly to buy something at any of those places. Instead, GiftRocket was charging $2 per card, plus 5% of the card's value, for a money-transfer product. The named business was merely a suggestion of where the gifted money might be spent. When recipients of a GiftRocket card clicked on it, they were directed to either deposit the money into their bank account or buy a gift card at another retailer, like Amazon.

The product upset both consumers who thought they were buying (or getting) typical gift cards and some merchants featured on the site, who complained they were listed without their consent and had to deal with angry shoppers who expected them to accept the GiftRocket cards directly. In 2022, a Brooklyn bakery and a Pennsylvania coffee shop filed a class action suit against GiftRocket in the Eastern District of New York, charging it with deceptive business practices, false advertising and unfair competition. GiftRocket has denied the allegations in the suit, and a spokesperson says, "We stand behind those denials, will continue to vigorously defend the case, and expect to prevail." Baum declined to be interviewed by *Forbes*.

The website for GiftRocket says that it stopped accepting orders as of January 1, 2025, but Tremendous seems to be growing nicely. Its website says it has facilitated $350 million in digital payments for 150 cases. Tremendous describes itself as "highly profitable" on its LinkedIn page and now has 140 employees, according to LinkedIn data, up from about 115 a year ago. A recent filing in the GiftRocket class action case included internal Slack messages from Tremendous executives, including one in which Tremendous' vice president of business operations said GiftRocket had "insane" breakage rates, which is why GiftRocket was profitable and why he considered it a lucrative client for Tremendous.

Early last year, a New Jersey resident filed a class action suit against Tremendous in the federal District of New Jersey court over its current class action payouts business, claiming its digital prepaid cards were misleading and not (as advertised) equivalent to cash, because the card couldn't be used at most brick-and-mortar stores. A Tremendous spokesperson says the company's prepaid cards are accepted at "the vast majority of physical retail stores" because you can add them to a virtual wallet on a smart phone and that the plaintiff withdrew the suit "due to lack of merit." (The plaintiff's attorney declined our request to comment.)

The larger and older Blackhawk Network was founded in 2001 as a subsidiary of Safeway, when the grocery store chain began selling gift cards in its stores. Blackhawk went public in April 2013 and was fully spun out from Safeway a year later. In 2018, Blackhawk was bought by private equity giant Silver Lake and hedge fund P2 Capital Partners at a $3.5 billion valuation. Shareholders filed multiple lawsuits accusing Blackhawk's CEO and board members of omitting important information about the merger negotiations and trying to sell the company at a lowball price. In 2022, insurers for Blackhawk settled for $30 million a stockholder class action suit accusing the company's CEO and chairman of breaching their fiduciary duties. Payments were sent to shareholders by check. Blackhawk denied the claims.

Meanwhile, a flurry of complaints emerged about Cardpool, a website for buying and selling pre-owned gift cards that Blackhawk had acquired in 2011. The site was plagued by fraud, with criminals reportedly selling on the site stolen gift cards, gift cards bought with stolen credit cards and gift cards whose balances were drained before buyers could use them.

By December 2020, Cardpool had attracted 2,187 Better Business Bureau

complaints over a three-year period, triggering the bureau to issue a national advisory about the risks of using it. Cardpool announced in early 2021 that it was shutting down.

Over the next few years, Blackhawk suffered two major data breaches, which led to multiple class action lawsuits. Some of these suits have since been dismissed, and one is on hold due to an appeal from a potential class member. Yet Blackhawk's overall business has continued to expand, reaching $2.9 billion in estimated revenue in 2023. Today it has more than 3,000 employees and processes $28 billion a year in transactions across all of its businesses. More recently, Blackhawk's owners have reportedly considered selling the company for more than $5 billion. (A Blackhawk spokesperson declined to comment on the possible sale.)

---

The problems with digital prepaid cards in class actions are finally starting to get more attention, thanks largely to Todd Hilsee. Some of the attorneys we spoke with for this article now have their antennas out. "This is absolutely something we'll be looking at in future settlements," says Ted Frank, a class action reform crusader who has been working for over a decade to try to rectify the injustices of class actions, appealing more than 100 settlements and often winning victories, such as smaller payouts for attorneys.

Some potential fixes to the problems seem obvious. For example, when settlement administrators ship out digital debit cards, they could provide clear, comprehensive tips on how to use them. They could demand that fintechs wait to start charging inactivity fees until at least 12 months have passed, as is required for gift cards. And they could email class members with reminders if they have unspent money on their cards, a feature that Digital Disbursements' Jeff Richardson says he'll be testing with Blackhawk later this year.

More disclosures in court filings, as well as more judicial oversight—both before and after payouts begin—is key. Fintech companies project breakage amounts in

their own business plans, so why not disclose that info to judges, plaintiffs' lawyers and settlement administrators? After payouts are made, something like the Northern District of California's post-distribution accounting form could be required and updated to include information about how many prepaid cards issued were used, how many ended up as breakage and who benefitted from the breakage pot.

Timothy Corcoran, a consultant who used to lead Angeion's class action administration business, thinks that companies shouldn't be afraid of more disclosures if they're doing everything above board. "If there's more scrutiny, that's great—then those who do things the right way aren't going to be disadvantaged."

—*Additional reporting by Stephen Pastis.*

## More from Forbes

FORBES

### The Fast-Growing Fintech Bringing Stripe-Like Payments To Latin America

By Jeff Kauflin

FORBES

### With Strong 2024 Growth, Chime Appears On Track For An IPO

By Jeff Kauflin

FORBES

Julio Flores
13708 Cordary Ave #261
Hawthorne CA 90250



SANTA CLARITA CA 913

22 APR

RECEIVED

APR 2 4 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MAILED

APR 2 2 2026

Clerk Of Court
U.S. District Court
450 Golden Gate Avenue
San Francisco CA 94102

94102-348999